UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE AGGRENOX ANTITRUST | : | |
| LITIGATION CLAIMS ADMINISTRATOR | : | |
| APPEAL | : | CIVIL ACTION NO. |
| | : | 3:18-mc-00067-SRU |
| | : | |
| Appeal of Claimants Winn-Dixie Stores, | : | |
| Inc., and Bi-Lo Holding LLC of Claim | : | |
| Administrator's Denial of Claim in Direct | : | |
| Purchaser Class Action Settlement | : | |

**MCKESSON CORPORATION'S OPPOSITION TO APPEAL OF
<u>WINN-DIXIE STORES, INC. AND BI-LO HOLDINGS LLC</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................1

II.    BACKGROUND ..................................................................................3

III.    DISCUSSION ......................................................................................4

    A.    Winn-Dixie is Not a Class Member and Has No Rights to Recover Under the Court Approved Settlement ..............................................................4

    B.    The Supreme Court Disallows Suits by Indirect Purchasers, and Any Exception for Cost-Plus Contracts Is Exceedingly Narrow..................................5

        1.    Winn-Dixie's Contract Does Not Contain a Commitment to Purchase a "Fixed Quantity" of Branded Aggrenox....................................7

        2.    The Supply Agreement Did Not Require Winn-Dixie to Make Purchases at a Fixed Markup Above McKesson's Own Acquisition Cost ........................................................................................11

        3.    There is Long Precedent Refusing to Apply the Cost-Plus Exception to Downstream Customers of Pharmaceutical Wholesalers .....................13

    C.    Winn-Dixie Offers No Policy Rationale for Creating or Expanding Exceptions to the Indirect Purchaser Bar, and Doing So Would Undermine Antitrust Enforcement...........................................................................16

IV.    CONCLUSION....................................................................................17

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*City of Philadelphia v. Public Employees Ben. Servs. Corp.*,
842 F. Supp. 827 (E.D. Pa. 1994) ........................................................................... 6

*County of Oakland v. City of Detroit*,
866 F.2d 839 (6th Cir. 1989) ................................................................................. 6

*Glynn-Brunswick Hospital Authority v. Becton Dickinson & Co.*,
159 F. Supp. 3d 1361 (S.D. Ga. 2016) ................................................................... 9

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) ......................................................... 2, 3, 6, 11, 14, 15, 16

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharm., Inc.*,
244 F. Supp. 3d 705 (M.D. Tenn. 2017) ........................................................... 9, 16

*Ill. Brick Co. v. Ill.*,
431 U.S. 720 (1977).......................................................... 2, 5, 6, 7, 8, 10, 14, 16

*In re Brand Name Prescription Drugs Antitrust Litigation*,
123 F.3d 599 (7th Cir. 1997) ............................................................................... 14

*In re Buspirone Patent Litig.*,
210 F.R.D. 43 (S.D.N.Y. 2002) ....................................................................... 6, 14

*In re Midwest Milk Monopolization Litig.*,
529 F. Supp. 1326 (W.D. Mo. 1982) ................................................................... 16

*In re Namenda Purchaser Antitrust Litigation*,
2017 U.S. Dist. LEXIS 95796 (S.D.N.Y. June 21, 2017) .............................. 10, 13, 14, 15

*In re OSB Antitrust Litig.*,
2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ....................................................... 6

*In re Wyoming Tight Sands Antitrust Cases*,
866 F.2d 1286 (10th Cir. 1989) ........................................................................... 10

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990) ........................................................... 2, 3, 5, 8, 10, 12, 14, 16

*La. Wholesale Drug Co. v. Becton Dickinson & Co.*,
2006 U.S. Dist. LEXIS 89353 (D.N.J. Sep. 7, 2006) ................................. 10, 15

*Lefrak v. Arabian Am. Oil Co.*,
    487 F. Supp. 808 (E.D.N.Y. 1980) ................................................................. 9, 10, 11, 12

*McCarthy v. Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996) ........................................................................... 6, 8, 9

*Meijer, Inc. v. Abbott Labs.*,
    251 F.R.D. 431 (N.D. Cal. 2008) ...................................................................... 11, 15

*Meijer, Inc. v. Barr Pharm. Inc.*,
    572 F. Supp. 2d 38 (D.D.C. 2008) ............................................................... 6, 10, 14, 15

*SE Missouri Hosp. v. C.R. Bard, Inc.*,
    642 F.3d 608 (8th Cir. 2011) .............................................................................. 17

*Simon v. KeySpan Corp.*,
    694 F.3d 196 (2d Cir. 2012) ......................................................................... 8, 12, 13

*St. Francis Med. Ctr. v. C.R. Bard, Inc.*,
    657 F. Supp. 2d 1069 (E.D. Mo. 2009) ................................................................. 17

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..................................................................... 3, 11, 14

**MCKESSON CORPORATION'S OPPOSITION TO APPEAL OF
WINN-DIXIE STORES, INC. AND BI-LO HOLDINGS LLC**

Real party in interest McKesson Corporation ("McKesson") hereby opposes the appeal of

Winn-Dixie Stores, Inc. and Bi-Lo Holding LLC (collectively "Winn-Dixie") to the Claims

Administrator's decision to reject Winn-Dixie's class settlement claim (ECF No. 1) (the

"Appeal").

## I.      INTRODUCTION

It is undisputed that Winn-Dixie is not a member of the Aggrenox Class for purposes of

its Appeal.[1]   The Class here is comprised of those who bought branded Aggrenox directly from

Defendants or their assignees.[2]   Winn-Dixie does not contend it is a direct purchaser of

Aggrenox or that it is a McKesson assignee.   It is an indirect purchaser only, having purchased

Aggrenox from national wholesaler McKesson.   Accordingly, the Court should dismiss Winn-

Dixie's Appeal at the threshold because it is an inappropriate and untimely objection to the

settlement and class definition.

Likewise, because Winn-Dixie is not a member of the Class, whether it has standing as

an indirect purchaser to pursue antitrust claims against the Defendants is irrelevant.   Even if its

---

[1]      Winn-Dixie's Appeal concerns its purchases of Aggrenox from McKesson.  McKesson
understands that Winn-Dixie also purchased Aggrenox from national wholesaler Cardinal
Health, Inc. and that Cardinal provided Winn-Dixie with a limited assignment of its claims.  This
appeal does not concern the Cardinal assignment, and McKesson takes no position with Winn-
Dixie's rights under the Cardinal assignment.  McKesson, however, did not provide Winn-Dixie
with an assignment.  For purposes of this brief, McKesson limits its discussion to Winn-Dixie's
purchases of Aggrenox from it.

[2]      "Defendants" include Boehringer Ingelheim Pharma GmbH & Co KG, Boehringer
Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc.; and Teva
Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., Barr Pharmaceuticals, Inc.
(n/k/a Barr Pharmaceuticals, LLC), Barr Laboratories Inc., Duramed Pharmaceuticals Inc. (n/k/a
Teva Women's Health Inc.), and Duramed Pharmaceutical Sales Corp. (n/k/a Teva Sales and
Marketing, Inc.).  Id. at 1-2.

standing argument were well founded (which it is not, as discussed below), this would at most mean that Winn-Dixie has standing to pursue claims against the Defendants, as opposed to having a right to a portion of McKesson's settlement recovery.

In any event, Winn-Dixie's standing argument is mistaken.  Winn-Dixie cannot recover for its indirect purchases under a long-standing, bright-line rule from the Supreme Court barring claims by indirect purchasers.  Indirect purchaser claims are prohibited, in part, because they would implicate complicated issues of proof in attempting to apportion overcharges between direct and indirect purchasers.  *See Ill. Brick Co. v. Ill.*, 431 U.S. 720, 737-47 (1977); *Kansas v. UtiliCorp United, Inc*., 497 U.S. 199, 208 (1990).  Permitting direct purchasers to serve as "private attorneys general" incentivizes them to "enforce the antitrust laws" by allowing them to recover "the full extent of the overcharge." *Ill. Brick*, 431 U.S. at 746.

Winn-Dixie's contention that it qualifies for an exception to the express bar under a "cost-plus contract" theory is also mistaken.  The Supreme Court has never affirmed the existence of such an exception and has held that, if it were to exist, the exception would have a very "narrow scope" and would only apply in cases of a "pre-existing cost-plus contract" where the downstream customer is committed to buying "a *fixed quantity* regardless of price." so "that the effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand."  *Ill. Brick*, 431 U.S. at 736; *see also Hanover Shoe, Inc. v. United Shoe Machinery Corp*., 392 U.S. 481, 494 (1968).

Even where the direct purchaser has passed on 100% of any overcharge, the Supreme Court has refused to apply a cost-plus contract exception.  *See UtiliCorp*, 497 U.S. at 218.  Indeed, the Court has made clear that any exception would be strictly limited to situations where the direct purchaser could not suffer any injury whatsoever.  *Id.*

2

In any event, even if a cost-plus contract exception were to exist, Winn-Dixie most certainly would not come within the exception. Winn-Dixie's Supply Agreement with McKesson[3] does not contain any pre-existing requirement for Winn-Dixie to purchase a "fixed quantity" of branded Aggrenox. Nor does the Supply Agreement require Winn-Dixie to purchase Aggrenox at a fixed markup above McKesson's own acquisition cost, thereby leaving McKesson to absorb some of the overcharges in contravention of the Court's guidance in *UtiliCorp*.

Notably, Winn-Dixie is not the first to argue that a pharmaceutical agreement between a wholesaler and its customer should qualify for the "cost-plus" exception. Each time, the courts have rejected these attempts, recognizing that "a distinction can and should be drawn between the cost-plus contracts employed in this [the pharmaceutical] industry and the cost-plus exception discussed by the Supreme Court in *Hanover Shoe v. United Shoe Machinery Corp*., 392 U.S. 481 (1968), and in *Kansas v. UtiliCorp United Inc*., 497 U.S. 199 (1990)." *Valley Drug Co. v. Geneva Pharm., Inc*., 350 F.3d 1181, 1190 n.19 (11th Cir. 2003). Winn-Dixie cites no contrary authority, because there is none.

For these reasons, the Appeal should be denied.

## II.   BACKGROUND

On September 19, 2017, the Court certified a Class for purposes of settlement and granted preliminary approval to the $146 million settlement between the Class of direct purchasers and the Defendants. Order at ¶¶ 2, 5-6, Sept. 19, 2017, Docket No. 3:14-cv-02516-

---

[3]     The Supply Agreement between Winn-Dixie Stores, Inc. and McKesson Corp. dated November 18, 2009 ("Supply Agreement") is attached to Appeal as Exhibit No. 3 and filed under seal.

(SRU), ECF No. 685 ("Preliminary Approval Order"). In relevant part, the Class is limited to the direct purchasers of Aggrenox, or their assignees. *Id.* at ¶ 2.[4]

On December 19, 2017, the Court granted final approval to the settlement. *See* Order ¶ 8, Dec. 19, 2017, Docket No. 3:14-cv-02516-(SRU), ECF No. 740 ("Final Approval Order"). Pursuant to the Final Approval Order, the Court directed the claims administrator to allocate and distribute the settlement fund to members of the Class as provided in the Plan of Allocation. *Id.* at ¶ 9. The Plan of Allocation likewise provided for the distribution of the Net Settlement Sum exclusively to members of the Class. Plan of Allocation at p. 1 (The Proposed Plan of Allocation allocates the Net Settlement Fund to Class members based on each "member's *pro rata* share of branded Aggrenox purchases."), Docket No. 3:14-cv-02516-(SRU), ECF No. 733-8.

Winn-Dixie admittedly is not a direct purchaser of Aggrenox, and it has no assignment rights from McKesson. It is thus not a Class member. Winn-Dixie's Appeal is premised on its potential claims as an indirect purchaser only and not as a direct purchaser under the settlement.

## III.    DISCUSSION

### A.    Winn-Dixie is Not a Class Member and Has No Rights to Recover Under the Court Approved Settlement

To have rights as a Class member under the Aggrenox settlement, an entity must either have purchased Aggrenox directly from the Defendants or have an assignment from a direct purchaser. Preliminary Approval Order at ¶ 2. Winn-Dixie is neither a direct purchaser nor a

---

[4]    The "Class" is defined in relevant part as follows:

> All persons or entities in the United States and its territories and possessions including the Commonwealth of Puerto Rico who directly purchased branded Aggrenox in any form from any of the Defendants from December 1, 2009 through June 30, 2015 (the "Class Period"), or their assignees (the "Class").

Preliminary Approval Order at ¶ 2.

McKesson assignee.  It is an indirect purchaser only.  Accordingly, for purposes of the Appeal, Aggrenox is not a Class member and has no right to seek a share of the settlement.

Winn-Dixie arguably could have objected to the class settlement or the limited class definition.  But it did not, and the deadline to make such objections has long passed.  Indeed, the Court granted final approval of the class settlement eight months ago.

Because Winn-Dixie is not a member of the Class or a party to the direct purchaser settlement agreement, it did not release its claims against the Defendants, nor were its claims resolved by the direct purchaser action.  Accordingly, should Winn-Dixie strongly believe it has indirect purchaser rights, then it potentially could still pursue that claim against the Defendants. Nothing in the direct purchaser class settlement prevents Winn-Dixie from making such a claim.

In short, Winn-Dixie's Appeal is procedurally flawed.  It wrongly attempts to modify and expand the Class definition and the class settlement to include indirect purchasers.  Winn-Dixie is the wrong party and this is the wrong time to challenge the direct purchaser settlement.

Accordingly, the Court should dismiss the Appeal at the threshold.

**B.      The Supreme Court Disallows Suits by Indirect Purchasers, and Any Exception for Cost-Plus Contracts Is Exceedingly Narrow**

The Supreme Court has long held that only entities that purchased the affected product directly from the defendant, and not indirect purchasers, can recover damages under the federal antitrust laws.  *Ill. Brick*, 431 U.S. at 737-47.  The direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers.  *UtiliCorp*, 497 U.S. at 208.

Under the direct purchaser rule, "direct purchasers are not only spared the burden of litigating the intricacies of pass-on but also are permitted to recover the full amount of the overcharge."  *Ill. Brick*, 431 U.S. at 745-46.  As the Supreme Court has held, Congress's goal of

5

"creating a group of 'private attorneys general' to enforce the antitrust laws under Section 4 [of

the Clayton Act] is better served by holding direct purchasers to be injured to the full extent of

the overcharge paid by them than by attempting to apportion the overcharge among all that may

have absorbed a part of it."  *Id.* at 746 (*quoting Hawaii v. Standard Oil Co. of Cal.*, 405 U.S.

251, 262 (1972)).  The direct purchaser is thus the appropriate party to bring suit, even though it

may have passed on some or all of a price increase to its own customers.  *Hanover Shoe*, 392

U.S. at 494.

      Winn-Dixie's sole argument for claiming it has standing to pursue claims against the

Aggrenox Defendants as an indirect purchaser is the "cost-plus exception."  (Appeal at pp. 2-5.)

Whether such an exception even exists is in serious doubt.[5]  But if a "cost-plus" exception to the

direct purchaser requirement exists, the Supreme Court has made clear the exception would be

very "narrow" and subject to at least two requirements that Winn-Dixie cannot meet.

Specifically, the "cost-plus" exception requires (1) a contract committing the indirect purchaser

to purchase from the direct purchaser "a *fixed quantity* [of the subject product] regardless of

---

[5]    *See*, *e.g.*, *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The vitality of the 'pre-existing cost-plus contract' exception is doubtful, however, in light of *UtiliCorp*"); *County of Oakland v. City of Detroit*, 866 F.2d 839, 849 (6th Cir. 1989) (expressing doubt as to existence of cost-plus exception); *In re Buspirone Patent Litig.*, 210 F.R.D. 43, 60 (S.D.N.Y. 2002) (citing *McCarthy*); *Meijer, Inc. v. Barr Pharm, Inc.,* 572 F. Supp. 2d 38, 65 (D.D.C. 2008); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418, at *9 (E.D. Pa. Aug. 3, 2007) ("Courts have almost never applied this exception, however … the exception's viability is doubtful, at best."); *City of Philadelphia v. Public Employees Ben. Servs. Corp.*, 842 F. Supp. 827, 833 (E.D. Pa. 1994) ("the pre-existing cost-plus exception … is so eviscerated that it is virtually non-existent").  Like previous courts, this Court need not decide if a "cost-plus" exception exists because Winn Dixie does not even come close to meeting the threshold requirements that would apply to such an exception.

price,"[6] and (2) such contract must constitute a "pre-existing cost-plus contract." *Ill. Brick*, 431 U.S. at 736.

As detailed below, Winn-Dixie cannot show that its purchase agreement with McKesson meets either of these threshold requirements for the hypothetical, narrow cost-plus exception. And as further detailed, this conclusion is in accord with every court decision that has evaluated pharmaceutical wholesale contracts – like the one between McKesson and Winn-Dixie.

> **1.  Winn-Dixie's Contract Does Not Contain a Commitment to Purchase a "Fixed Quantity" of Branded Aggrenox**

The Supreme Court has stated that any "cost-plus" exception would only apply where an indirect purchaser is subject to a contract that requires it to buy "a *fixed quantity* regardless of price," such that the direct purchaser is wholly "insulated" from any overcharge. *Ill. Brick*, 431 U.S. at 736.  It is only when the indirect purchaser is committed to purchasing a fixed quantity of the affected product at a fixed markup such that "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination [of damages] in the general case." *Id.*

The "fixed quantity" requirement is dispositive.  Even where 100% of defendants' illegal overcharge was passed on from a direct purchaser to an indirect purchaser, the cost-plus exception is not applicable where the indirect purchasers were not contractually committed to purchasing a particular quantity of the overcharged product:

> The utility customers [*i.e.,* indirect purchasers] made no commitment to purchase any particular quantity of gas … Even though the respondent [direct purchaser] raised its prices to cover its costs, we cannot ascertain its precise injury because … we do not know what might have happened in the absence of an overcharge.  In addition, even if utility customers had a highly inelastic demand for natural gas … the need to inquire into the

---

[6]     The Court was referring to a "fixed quantity" *of the product subject to an overcharge*. *Ill. Brick*, 431 U.S. at 736.

> precise operation of market forces would negate the simplicity and
> certainty that could justify a cost-plus exception.

*Kansas v. UtiliCorp United Inc*., 497 U.S. 199, 209, 218 (1990); *see also Simon v. KeySpan*

*Corp*., 694 F.3d 196, 202-203 (2d Cir. 2012) (cost-plus exception not applicable because plaintiff

was not obligated in advance to purchase a fixed quantity of the affected product each month and

hence one "cannot say with any certainty what would have occurred in the absence of an

overcharge.").

Winn-Dixie's Supply Agreement with McKesson is not a "fixed quantity" contract, for at

least three reasons:

**<u>First</u>**, not only does the Supply Agreement not require Winn-Dixie to buy any specific

amount of Aggrenox, it does not require Winn Dixie to purchase any Aggrenox at all.  Winn-

Dixie's commitment to buy a minimum volume of amount of pharmaceuticals from McKesson

(Supply Agreement ¶ 5(A)) is not specific to Aggrenox purchases.  Accordingly, the Supply

Agreement did not commit Winn Dixie to buy any (let alone a fixed quantity of) Aggrenox from

McKesson; all of Winn Dixie's contractual obligations could have been satisfied by buying

drugs other than Aggrenox.

 Courts construe "fixed quantity" to mean a set amount of the product subject to the

overcharge, not some other product that a wholesaler might sell.  Under *Illinois Brick,* "fixed

quantity" means a commitment to buy a set amount of the affected product at the outset of the

contract period.  431 U.S. at 736.  Subsequent cases are in accord.  *See*, *e.g., UtiliCorp*, 497 U.S.

at 218 ("[t]he utility customers made no commitment to purchase any *particular quantity of*

*gas*") (emphasis added); *Simon*, 294 F.3d at 204 (plaintiff "was not contractually obligated in

advance to purchase a *fixed quantity of electricity* each month") (emphasis added); *McCarthy*, 80

F.3d at 855 ("plaintiffs have failed to show the existence of a pre-existing agreement to purchase *a fixed quantity of photocopies*") (emphasis added).

The case of *Glynn-Brunswick Hospital Authority v. Becton Dickinson & Co.*, 159 F. Supp. 3d 1361, 1372-73 (S.D. Ga. 2016), is instructive. There, the plaintiff alleged it satisfied the "fixed quantity" requirement because it made a total "volume commitment" to buy various products from its wholesaler, including potentially the subject hypodermic syringes and IV catheters. *Id.* Like the present case, this was not enough to warrant a cost-plus exception because the plaintiff's agreement "to purchase a minimum dollar amount of assorted healthcare supplies" did not mean "that they have given [the direct purchasers] any guarantee that they will purchase any of Defendant's hypodermic syringes and IV catheters at all, much less a fixed quantity thereof." *Id.*

**Second**, a requirements contract – obligating a customer to buy all or some of its "requirements" of an affected product – does not constitute a "fixed quantity" requirement that passes muster under the "cost-plus" case law. The law is clear on this point. *See*, *e.g.*, *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharm., Inc.*, 244 F. Supp. 3d 705, 714 (M.D. Tenn. 2017) (downstream purchaser's contract with McKesson to supply the customer's "requirements" did not satisfy "fixed quantity" element);[7] *Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808, 819 (E.D.N.Y. 1980) ("Fixed quantity thus involves a relationship

---

[7]    Winn-Dixie incorrectly attempts to distinguish *Hospital Authority*, contending the subject contract there contained "absolutely no fixed quantity provision." Appeal at 6. In fact, the supply agreement there is directly analogous to the supply agreement between Winn-Dixie and McKesson in that it compelled the the hospital-customer to "buy enoxaparin in whatever quantity is dictated by the needs of its patient population." *Id*. at 712-13. So, like Winn-Dixie here, the indirect purchaser in *Hospital Authority* was obliged to buy its requirements of the affected drug from the direct purchaser (which happened to be McKesson). The *Hospital Authority* court concluded that in such circumstances, demand for the drug might be dictated by price, and the customer was free to vary its demand accordingly.

whereby a party is locked into buying a fixed amount regardless of price fluctuations and with no recourse in the open market for buying a greater or lesser quantity at competitive prices."); and *In re Wyoming Tight Sands Antitrust Cases*, 866 F.2d 1286, 1292 (10th Cir. 1989) (contention that requirements contract meets cost-plus requirements is akin "to fitting a square peg into a round hole" because "[t]here exists no contract . . . for any particular quantity."), *aff'd sub nom. Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199 (1990).

Stated simply, "it would be anomalous to hold in the face of *Illinois Brick* that a requirements contract is per se a cost-plus contract, when in reality those contracts are designed to avoid the exactness imposed by the Supreme Court for determining the existence of a cost-plus contract." *Lefrak*, 487 F. Supp. at 823 n.21.

In the present case, the volume of Winn-Dixie's purchases of Aggrenox could vary. Winn-Dixie could opt to reduce, increase, or even eliminate entirely its purchases of Aggrenox. Alternatively, other market forces could influence Winn Dixie's need for Aggrenox, such as third-party insurers that can make decisions based on cost factors. Accordingly, Winn-Dixie's requirements obligations do not come close to meeting the "fixed quantity" requirement of a cost-plus contract. *See, e.g., In re Namenda Purchaser Antitrust Litigation*, 2017 U.S. Dist. LEXIS 95796, at *21-22 (S.D.N.Y. June 21, 2017) (cost-plus exception not applicable in the context of pharmaceutical supply agreements where customer was not obligated to purchase fixed quantity of specific pharmaceutical); *Barr Pharm.,* 572 F. Supp. 2d at 65 (pharmaceutical wholesaler contracts did not meet exception without evidence "referenced contracts are for a fixed quantity"); *La. Wholesale Drug Co.*, 2006 U.S. Dist. LEXIS 89353 (D.N.J. Sep. 7, 2006), at *22 (wholesaler contract did not "require[e] the indirect purchaser to buy a fixed quantity of products.").

**Third**, under the plain language of the Supply Agreement, Winn-Dixie could have made purchases of Aggrenox from another supplier.  Winn-Dixie's designation of McKesson's position as a "primary supplier" did not require it to buy 100% of its needs from McKesson.[8]  Winn-Dixie could, for instance, have purchased some or all of its Aggrenox purchases from another national wholesaler and still have remained compliant with its obligations under the Supply Agreement.  The ability to purchase from another supplier "militate[s] against a finding that actual costs were automatically passed on to the indirect purchaser without reference to the interaction of supply and demand."  *Lefrak*, 487 F. Supp. at 822.

That Winn-Dixie may have only purchased Aggrenox from McKesson is of no consequence.  The operative question is whether Winn-Dixie had a pre-existing commitment to buy a specific volume of Aggrenox prior to the imposition of the overcharge.  The answer:  It did not.

### 2. The Supply Agreement Did Not Require Winn-Dixie to Make Purchases at a Fixed Markup Above McKesson's Own Acquisition Cost

The "cost-plus" exception is also not applicable because the Supply Agreement is not a true cost-plus contract; *i.e.*, it does not require Winn-Dixie to purchase Aggrenox at fixed markups above McKesson's purchase price.[9]  This is true in two significant respects:

---

[8]      The Supply Agreement requires Aggrenox to purchase 95% of its aggregate brand drug purchases from McKesson after the first year.  Accordingly, Winn-Dixie could have purchased Aggrenox from other wholesalers in quantities up to 5% of its total brand drug purchases. (Supply Agreement ¶ 2.)

[9]      That the Supply Agreement contains "cost-plus" language is insufficient to qualify for the exception.  As the Eleventh Circuit has noted, "the fact that the buyers employ this terminology [i.e. "cost-plus"] does not in and of itself establish that the pharmaceutical industry would be covered by the cost-plus exception from the *Hanover Shoe* rule."  *Valley Drug Co*., 350 F.3d at 1190 n.19.  *See also Meijer, Inc. v. Abbott Labs.,* 251 F.R.D. 431, 433-36 (N.D. Cal. 2008) (cost-plus "pricing" insufficient).

**First**, the price that Winn-Dixie paid for Aggrenox (and other drugs) is not equal to McKesson's purchase price.  Winn-Dixie's purchase price was equal to "Cost" plus an applicable markup, where "Cost" is defined as "the manufacturer's published acquisition cost ("WAC") *at the time of the order*, adjusted for selected bonus goods, manufacturers' off-invoice allowances, and manufacturers' deal prices to be made available to Winn-Dixie in accordance with McKesson's established policies."  Supply Agreement ¶(5)(B) (emphasis added).   Because the published acquisition cost could change between the time when McKesson purchases products and when Winn-Dixie places an order, there will be time when McKesson's acquisition cost will differ from Winn-Dixie's purchase price.  Additionally, Winn-Dixie's cost includes various deal prices and bonuses, thereby creating more gaps between Winn-Dixie and McKesson's cost.

The Supreme Court has warned that any "cost-plus" exception should not be applied where there could be "difficult questions of timing" that "may delay the passing-on process" and render it difficult to disentangle whether and how much of the overcharge was borne by the direct purchaser.  *See UtiliCorp*, 497 U.S. at 210-11 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 475 n. 11 (1982) ("The difficulties posed by issues of this sort [*i.e.*, timing] led us to adopt the direct purchaser rule, and we must decline to create an exception that would require their litigation.").

Likewise, where, as here, the cost paid by Winn-Dixie is not necessarily equal to McKesson's own cost, the cost-plus exception is not applicable.  *Simon*, 694 F.3d at 202 (cost-plus exception only applicable where indirect purchaser agreed to pay direct purchaser's costs); *see also Lefrak*, 487 F. Supp. at 819 (an "essential" element of the exception is that "there exists an automatic pass on to the full extent of the overcharge to indirect purchasers[.]").

**Second**, there is no "fixed markup" here.  The tables that Winn-Dixie references in ¶ 5(C)(2) of the Supply Agreement include negative percentage markups, that is, Winn-Dixie may pay on a "cost minus" basis *below* McKesson's prevailing Cost.[10]  The markup is also not "fixed," as it varies depending on Winn-Dixie's total purchase volume from McKesson of other products.

Where, as here, Winn-Dixie's price is not fixed at a set markup above McKesson's acquisition costs, the cost-plus exception is not applicable.  *See Simon*, 694 F.3d at 202 (indirect purchaser must agree to "pay[] the direct purchaser's costs plus a predetermined additional fee.") (citation omitted); *In re Namenda*, 2017 U.S. Dist. LEXIS 95796, at *22 (pharmaceutical wholesaler agreements like the one here that did not require "customers … to purchase specific quantities at a fixed markup" did not qualify for cost-plus exception).

### 3.  There is Long Precedent Refusing to Apply the Cost-Plus Exception to Downstream Customers of Pharmaceutical Wholesalers

Many courts have examined the possible existence of a cost-plus exception with respect to a pharmaceutical supply contract like the one between Winn-Dixie and McKesson. Significantly, Winn-Dixie has not cited to one such case to support its position.  The reason for this is simple: Courts that have examined pharmaceutical supply contracts, including McKesson's contracts with other customers, have uniformly rejected allowing indirect purchasers standing to sue, even though "cost-plus" language and concepts are common ins pharmaceutical supply agreements.

---

[10]    Under a cost-minus arrangement, McKesson is selling to Winn-Dixie at a percentage *below* McKesson's own purchase price for the product.  If the overcharge is less than the amount of the discount, it is McKesson, not Winn-Dixie, that absorbs the entirety of the overcharge.  If the overcharge is greater than the amount of the discount, one must then net out the amount of the overcharge born by McKesson and the amount passed on to Winn-Dixie.

In *Valley Drug Co. v. Geneva Pharm.,*350 F.3d 1181 (11th Cir. 2003), the court found that the "cost-plus" contracts used by McKesson and other national wholesalers are not equal to the cost-plus exception contemplated in *Hanover* Shoe:

> [A] distinction can and should be drawn between the cost-plus contracts employed in this [the pharmaceutical] industry and the cost-plus exception discussed by the Supreme Court in *Hanover Shoe v. United Shoe Machinery Corp*., 392 U.S. 481 (1968), and *in Kansas v. UtiliCorp United Inc.*, 497 U.S. 199 (1990). Although the defendants have noted that industry buyers negotiate contracts on a 'cost-plus' basis, the fact that the buyers employ this terminology does not in and of itself establish that the pharmaceutical industry would be covered by the cost-plus exception from the Hanover Shoe rule.

*Id.* at 1190 n.19 (11th Cir. 2003); *see also In re Buspirone Patent Litig*., 210 F.R.D. 43, 60 (S.D.N.Y. 2002) (McKesson's retailer supply agreement did not fall within the cost-plus exception).

Similarly, in *In re Brand Name Prescription Drugs Antitrust Litigation*, the Seventh Circuit concluded that drug wholesalers, and not downstream customers, are the appropriate antitrust plaintiffs even if the wholesalers passed on any overcharge: "This is just the kind of complaint that *Illinois Brick* bars. The only entities permitted to complain about the manufacturers' overcharging the wholesalers are the wholesalers themselves, the direct purchasers, even if every cent of the overcharge was promptly and fully passed on to the pharmacies in the form of a higher wholesale price." 123 F.3d 599, 606 (7th Cir. 1997)

Other decisions spanning sixteen years uniformly hold that pharmaceutical wholesaler agreements do not qualify for the cost-plus exception. *See In re Namenda,* 2017 U.S. Dist. LEXIS 95796, at *21-22 (holding that supply agreement between wholesaler and customer did not require customer to purchase specific quantities of products at a fixed markup); *Meijer, Inc. v. Barr Pharm. Inc.,* 572 F. Supp. 2d 38, 65 (D.D.C. 2008) (rejecting argument that

14

pharmaceutical wholesaler contracts qualified under cost plus exception absent evidence "referenced contracts are for a fixed quantity" or "operate so as to make the effect of any overcharge preordained). *Cf. La. Wholesale Drug Co. v. Becton Dickinson & Co.*, No. 1730, 2006 U.S. Dist. LEXIS 89353, at *22 (D.N.J. Sep. 7, 2006) ("the cost-plus exception is only applicable where there is a contract requiring the indirect purchaser to buy a fixed quantity of products. That does not appear to be the case with this putative class member.").

In opposition, Winn-Dixie wrongly attempts to distinguish such decisions on the basis that they involved discovery motions or class certification issues.  (Appeal at 6.)  Winn-Dixie has the import of these cases backwards.  These courts held that the purported "cost-plus" agreements before them so clearly did not meet the exception that they even precluded any discovery on the issue, foreclosing any evidentiary hearing or trial.[11]

Overall, if the "cost-plus exception" exists, it is narrow and has strict requirements.  For the same reasons that courts have uniformly refused to apply the cost-plus exception to the downstream customers of pharmaceutical wholesalers, the Court should refuse to apply the exception in the present case.

---

[11]    *See*, *e.g.*, *In re Namenda*, 2017 U.S. Dist. LEXIS 95796, *23 ("Forest cites no precedent that suggests that such agreements can be the basis for the cost-plus exception, and the cases above make clear that they cannot" and refusing to circumvent commands of *Hanover Shoe* and its progeny; *Abbott Labs.*, 251 F.R.D. at 434 (denying discovery as to applicability of cost-plus exception because "'the Supreme Court has rejected a number of attempts to carve out exceptions to the *Hanover Shoe* rule for particular types of markets, when the attempts reintroduced the need to assess the effects of an overcharge on the purchaser's prices, costs, sales, and profits.'").  Also, *Barr Pharmaceuticals* was decided upon a motion for summary judgment decision (rather than class certification or a motion to compel), and refused to deprive drug wholesalers of direct purchaser standing. *See* 572 F. Supp. 2d at 65.

**C.**     **Winn-Dixie Offers No Policy Rationale for Creating or Expanding Exceptions to the Indirect Purchaser Bar, and Doing So Would Undermine Antitrust Enforcement**

Unable to meet the letter of the law for the exception, Winn-Dixie also invokes its "spirit."  But the Supreme Court has roundly rebuffed "attempts to carve out exceptions to the *Hanover Shoe* rule for particular types of markets."  *Illinois Brick*, 431 U.S. at 744.  Both the Supreme Court and the Court of Appeals have refused to apply the exception in settings far more appropriate for such a plea – e.g., where the middlemen passed on 100% of the overcharge and demand was highly inelastic.  *See UtiliCorp*, *supra*; *Simon*, *supra*.

Heeding such guidance, courts have declined to craft "functional equivalents" of the cost-plus exception.  *See*, *e.g.*, *Hosp. Auth.*, 2017 WL 1064308, at *6 ("Opening the cost-plus exception to transactions that merely involve the functional equivalent of a fixed-quantity provision, however, would unavoidably lead the Court back into the factual and analytical thicket that *Illinois Brick* was intended to avoid … This Court will not embark down that road when the Supreme Court has so strongly cautioned against it."); *In re Midwest Milk Monopolization Litig.*, 529 F. Supp. 1326, 1332 (W.D. Mo. 1982) (rejecting argument to adopt "functional equivalent" of cost-plus contract), *aff'd* 730 F.2d 528 (8th Cir. 1984).

Expanding the exception to include Winn-Dixie would undercut, rather the implement the "spirit" of the *Illinois Brick* rule.[12]   The Supreme Court "spared" direct purchasers the burden of litigating pass-on effects precisely to promote enforcement of the antitrust laws.  *Ill. Brick* at 745-56.  Here, direct purchasers have already stepped forward and pursued claims here to deter future violations, *id.* at 746, rendering any appeal to permit indirect purchaser claims particularly weak.  *See UtiliCorp*, 497 U.S. at 21-15 (refusing to allow indirect purchaser standing where

---

[12]     Notably, Winn-Dixie also passes on any overcharge it pays to its customers.  It is disingenuous for Winn-Dixie to argue that it, not McKesson, is the injured party.

direct purchasers had sufficient incentive to sue overcharging suppliers); *St. Francis Med. Ctr. v. C.R. Bard, Inc.*, 657 F. Supp. 2d 1069, 1106 (E.D. Mo. 2009) (noting reduced need to recognize indirect purchaser standing where defendants have "already faced antitrust claims" by direct purchasers), *aff'd sub nom. Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608 (8th Cir. 2011).

## IV.    CONCLUSION

For these reasons, and for those set forth above, McKesson Corporation respectfully requests that the Court deny Winn-Dixie's Appeal.

**McKESSON CORPORATION**


BY: /s/ Patrick M. Noonan (ct#00189)
     Patrick M. Noonan
     Donahue, Durham & Noonan, P.C.
     741 Boston Post Road
     Guilford, CT 06437
     (203) 458-9168

17

## CERTIFICATE OF SERVICE

I, Patrick M. Noonan, hereby certify that on August 23, 2018, I caused a copy of the foregoing document to be uploaded to the Court's CM/ECF system, where it is available for downloading and viewing.

/s/ Patrick M. Noonan (ct#00189)